Corporation v. Hap Trading One second. Let the folks clear out. Alright, so I want to make sure it's Mr. DeGarcin. Am I saying that right? Yes, you did. Alright, so Mr. DeGarcin, you have reserved three minutes for rebuttal, so the floor is yours. Thank you, Your Honor. May it please the Court. Samir DeGarcin for the appellant. Hap agrees on page 26 of its response brief that the court inquiry is whether it established and maintained a, quote, forum in which parties buy and sell a security that is not on a national exchange. There are two independent reasons why it cannot satisfy that test. First, Hap did not establish or maintain anything. Everyone agrees the statutory establish or maintain language is targeted at the concept of a market maker. Market makers occupy a specific niche role in our financial system. They're entities that function as an alternative to the exchange by, one, publicly quoting bid and ask prices for securities, and then standing ready to buy and sell securities at those prices. In other words, if I want to go and buy 10 shares of Clarus stock, a market maker needs to quote me the price that it will sell Clarus stock, and it has to stand ready. Publicly quoted. What do you mean by that? It has to be some place in which I'm aware that the market maker is going to charge a specific price for the stock. So it's a little bit like a – I think the quintessential example is a foreign exchange counter at an airport. You know, you see the prices that it's willing to buy and sell dollars at, and you know – So you're saying it has to be posted someplace? I think that's typically how it's done. Well, it might be typically how it's done. I guess that's the question, though, is that how it has to be done. I think it at least has to have – What's your quote for this share is not sufficient? I think it would at least have to be public in the sense that if you called up and then Judge Lee called up, I'd have to quote you the same price. So whether you post it publicly or you at least have the quote and you respond with the same quote, and then you stand ready to buy at that particular price. And the way the market maker makes its money is it buys and sells the securities at the quoted prices, and it makes money on the bid-ask spread. And this court's precedent describes it that way. You know, the SEC guidance does, Black's Law Dictionary, every treatise. So how is HAP making money here? That's fuzzy to me. Yeah, it's nothing like that. I mean, as far as we can tell, the way HAP makes its money is by using sort of arbitrage-style strategies of figuring out whether certain derivatives are mispriced. And then it trades on packages seeking to make them delta neutral to reduce its risk. And then it's sort of like a lot of trading firms do. That's kind of how it makes money, by doing those kinds of transactions in high volume. But it's not – Doing them in high volume, meaning what? They're taking just like a broker for you? No, they're not. I mean, I think – I mean, again, the finance component is complex, but it's undisputed that they're not saying, I'm going to buy securities at a particular price, and I'm going to sell securities at a particular price. And I think it's undisputed they're not even doing that for packages. They're not buying the package and then selling that same package in the way that someone at your foreign exchange counter is doing. They are trying to figure out what – you know, they're trying to figure out this sort of – you know, it's – they're trying to exploit pricing differentials and transient mispricing across Claris equity and security options. And that's a JA 138 to 142. But at no point does anyone think that they're acting like a market maker for securities. But nobody thinks they're inside of trading, right? I mean, that's the basic genesis for 16D is the concern about, you know, traders, basically holders of more than 10 percent of the stock, being able to access inside information and trading on it. There's no whiff of that here, right? No, we disagree with that. I mean, we – and this is a – we dispute that. You know, they say it there. They try to proffer that HAP is not trading on fundamentals. We dispute that at JA 2832 to 2833. Well, how are they getting access to this? I mean, just merely having a lot of shares doesn't give you access. Well, but, I mean, it's a strict liability statute. So the point is – I know that. But it's a statute that we have said before was, you know, motivated by a desire to prevent insider trading. And so I'm just trying to figure it out. I mean, you're not suggesting that they get access to the board or are getting reports that other shareholders are not. Oh, no, but that's always the case when you have a 16B case against a beneficial owner. The whole point of the statute was when you have a beneficial owner who's not covered as a director or some actual corporate insider, but if they have, as in this case, 32 percent of a company's stock, then there is a substantial likelihood or a substantial possibility that they could end up being insider traders. And it's very difficult to prove that. So the statute imposes strict liability on anyone who's a beneficial owner of a large amount of stock. And then it makes these exemptions, and the exemptions are extremely narrow. The exemption here for market makers was designed because Congress believed that if you had an OTC market maker, and usually typically a company that, you know, was not trading on a national exchange and was very small, if you were making a market in that stock, if you were acting like the foreign exchange, you know, broker at the airport, you have to hold a lot of the company's stock because necessarily you have to stand ready to be able to buy the stock if someone comes to you or sell the stock if someone comes to you, and otherwise you can't be a market maker. So you have to hold a lot of stock necessarily, and because of that, you might accidentally accrue so much that you may end up incurring liability. That is nothing. There is no reason why HAP has to hold large amounts of Clara stock. HAP wants to hold large amounts of Clara stock because based on its, you know, bespoke trading, you know, mechanisms, platforms, it thinks it's going to make a lot of money implementing its trading strategies. But it is not a market maker under any reasonable definition. But I guess I'm trying to figure out, and I haven't been able to figure out who is picking Clara's stock. Now, there's the people who are calling to buy these packages. There are already people with positions in Clara's, or there are people who want to acquire positions in Clara's, or they're just looking for some instrument that is going to, or some combination of assets that is going to hedge for that. I think if they are looking to sell a package to HAP, then there are people who already have that package, and there are positions in Clara's stock. So they already have positions in Clara's stock, and so they're looking to hedge. I mean, the delta neutral is basically hedging. My understanding is the delta neutral is, and this is in the OVADAR report at JA129, you know, is that the hedging is basically the strategy that HAP is using. And I think this is important. You know, they basically want to decide which packages they will and will not trade on. So they want to make sure that they have delta neutral packages. And so they'll only take, and even as to packages, they'll only take, and if you look at the chats, this is at JA224 to 233, you know, the way in which this all works is someone will come and they'll offer a package to HAP. HAP will say, well, actually, I'm not sure I want that package. Sometimes it will reject them outright. That's at JA235. Sometimes it will, you know, it will always at least negotiate, decide whether it wants that package or a slightly different package, negotiate at a price. So standing ready to negotiate means they want to make sure that they only trade on packages that accomplish this delta neutral strategy. So they have a specific thing that they want in the market. Well, I'm more interested in the motivation of the person who is the counterparty to the package. So what's motivating the person who offers the package or who deals with HAP? I don't think there's any testimony or evidence as to what the motivation of the other entity is. There's nothing to indicate that they are insiders themselves or people who have been tipped by insiders, right? There's nothing like that. I mean, that's not clear from this record, Your Honor. I mean, that's all information I think that we can – I mean, we're at summary judgment. So the question is, you know, can any – and there's a lot of this stuff is, I think, necessary to develop. The question is – Well, we're at summary judgment, so discovery is closed, right? Well, correct. So there's no more development that can happen. So the answer is there's nothing to suggest that there's any insider who is trying to use these packages to preserve the value that they got from doing insider trades. Well, we – I don't think that's – yeah, I don't think so. But we do dispute that they were not trying to speculate on fundamentals. And the whole point is this is a strict liability statute that says when you own 30-plus percent of a company's stock, we don't have to prove that there was actual insider trading or that we – you know, that they had information. I understand. Right. The question ultimately, I think, and there's two independent bases, and they're quite technical questions, but one is were they establishing and maintaining a market? The way in which the HAP interprets that phrase, I think, would lead to essentially anyone with a proprietary trading strategy being able to avail themselves of the exception by saying, well, we're establishing and maintaining the market because we're just trading in high volume. If you look at the way they kind of gerrymander, for example, the statutory definition, they read out the phrase by entering quotations in an inter-dealer communication system, which, you know, violates cardinal rules of statutory interpretation. But I think the key point is they want the statute to basically just say, if you hold yourself out as someone who buys and sells securities on a regular and continuous basis, then you're a market maker. I'm someone – I mean, anyone who trades is someone who theoretically can buy and sell securities. If you're doing it at high volume, then you're doing it on what they would say a regular basis. And, you know, that's not a market maker. A market maker is not someone who just trades in high volume. And hundreds of entities would be able to avail themselves of the market maker exception. Well, I'm trying to figure this out. They're right about that. Everybody's groping for an analogy. I thought soda cans was not a particularly helpful one. Bouquets of Flowers was a more intriguing one, where it's a bundle of securities that are available on different exchanges. So they're not all available in the same place. And this bundle is attractive to a type of investor who's not your typical long-term investor or speculative investor who just are going to use the national market. This is somebody who wants a more bespoke product. And so I guess I'm trying to figure out why wouldn't that be a secondary market that achieves the sort of things that you generally want from over-the-counter secondary markets. It's increasing liquidity. It's bringing a lot of volume. There's a lot of people who seem to want to do this who wouldn't be satisfied by just going to the national markets themselves. Because that is not a market for securities. The securities in this situation are being traded on the national exchange. But also that isn't market-making in securities, because market-making in securities means standing ready to buy and sell securities if someone wants them. So if I want to buy 10 shares of Clara stock, I should be able to go to Hap and buy that. Hap will say no. A hundred percent of times, Hap will say, what are you talking about? We don't do that. We don't just buy and sell Clara stock. We trade in packages. And then you say, well, okay, do you stand ready to always buy and sell the package? No. They don't stand ready to buy and sell the package. If I go and say, do you want this package? They might say no. They might say, I want to change the price. They might say anything. That just means they are trading in packages. You're going back to your just that there's not a quote that is publicly offered. No. It's just that they're not fundamentally doing what a market-maker does. And this idea of the quote, by the way, I mean, you know, Black's Law Dictionary defines it as, one, it helps establish a market for securities by reporting bid and ask quotations and who stands ready to buy and sell. This court's precedent describes it as, this is an SEC-first Jersey security, must hold itself out in the inter-dealer market as ready to purchase securities at a particular price. Every single court of appeals defines it that way. The treatise has defined it this way. This is how the SEC defines it. A market-maker is a firm that stands ready to buy and sell stock at a publicly quoted price. So this is what a market-maker is. This is what it is to establish and maintain a market. It is to be like the foreign exchange counter and it's to be an alternative to the exchange. Well, I'm not sure it's required to be like the foreign exchange counter. I mean, it seems to me that there's a lot more contemplated than just that in the exception. We have not seen a single case anyway or a single regulatory material that contemplates an act like HAP that is basically just saying we are trading in packages. We would trade in a package if it meets the specifications that we want. We will not trade in packages if it doesn't meet the specifications that we want to be anything like a market-maker because it's not. Well, I haven't found anything like it either. I mean, we have SEC letters going back now 20 and 30 years that strike me as sort of distinguishable. But I'm sort of surprised that the SEC seems disinterested in this. If this is as troubling as you suggest. We would absolutely welcome the SEC to comment on this. We feel very confident in our assessment that this is not, this falls well outside the scope of what the narrow market-makers. Well, maybe, but my point is that the SEC doesn't usually wait for invitations or invitations from a court. They're typically scouring the marketplace to see where there's sort of troubling activity. But they haven't, they don't seem terribly troubled by this. And I guess I'm trying to figure out why you're troubled by this. I mean, is it just that this is a great opportunity to get $60 million? Or is there something that is harmful about this because it doesn't seem to be insider trading. And it's not clear to me that it's anything else that would be bad for Claris. If anything, it seems to me probably this activity drove up the price of Claris stock. Yeah, that's always the case in a short swing case. You know, it's all, but people bring short swing actions because there is the possibility when someone learns that he has any of your stock that the reason they made their money is because of, you know, inside information. And Congress understood that, and that's why it imposed strict liability. This court did invite briefing from the SEC and CRO Realty. And so I do think that is something that does happen and could be an option. But there's only one amicus that's here, and they're going, they're signing that. And they have their institutional interest. I mean, ultimately. I mean, what's their institutional interest? Because this essentially would blow open the 16D exemption and make all kinds of traders that just implement their own. Well, they're inside ones. It wouldn't change that. Sorry, Your Honor. Insiders would not be. It absolutely would, Your Honor, because if a huge number of new entities can now avail themselves of a 16D exemption, it makes it much, much more difficult to bring a 16B action. And, of course, in some of those situations, there will be insider trading, and it will be much harder to police because it will be hard to prove intent, which was exactly the thing that Congress was concerned about when it imposed strict liability into 16B, and then it had these narrow exemptions. And we all know that what Congress was concerned about with the market maker exemption was if you're completely separate from the exchange, you're not availing yourself of the exchange, you're OTC, a lot of companies that are not traded on the national exchange are going to be small. And if you want to make a market and provide liquidity there, as in if you are standing ready, you have to buy and you have to sell at specific prices. Not you're negotiating, not it's at your discretion. You have to buy and you have to sell. Then, of course, you have to hold. And if you have to hold, you might end up holding too much, and you might end up being subject to short-swing liability. Now, there are people like this called specialists on the national exchange, and Congress didn't impose liability or didn't apply the exemption to them because they said, if you're dealing on the national exchange, you're the kind of entity that could probably, and this is in the Romeo and Die treatise, probably structure your transactions and know enough about this that you probably are going to be able to make sure that you avoid Section 16B liability. So that's how narrow this was. This is if you're not on the exchange, if you're completely separate from the exchange, if you're just OTC, you're mostly dealing with small companies, you may inadvertently end up holding a lot of securities because you have to buy and you have to sell those securities. A company like HAP that does not have to buy, does not have to sell, does not do those things, that trades on a tiny fraction of the offers that it receives, that does not. What's the state of the record on the tiny fraction? I guess you keep saying that, but is that clear from the record? I mean, yeah, the record just has these chats. The record does not explain how many times HAP comes in and says. Well, maybe it's not, but you're saying it's a tiny fraction, so you figured it out. So tell me, what is your reason for saying a tiny fraction? Sorry, by tiny fraction, I don't mean of the offers it receives, but brokers are already coming to HAP with a specific package that is trying to implement the delta neutral strategy. So tiny fraction is of all the possible packages of things in the entire world, how many of them are going to be delta neutral? Obviously, a tiny fraction are delta neutral. We know from the Ovidal report that HAP's strategy here is to try to accomplish delta neutrality. And so when brokers come to HAP, they're already offering HAP things that HAP, the specific kind of package that it thinks HAP might want. These are not people who just want to offload a package, like I want to offload securities, using an alternative to the exchange. And then HAP is then, almost on every occasion, negotiates with them. It never stands ready and says, okay, I will buy it at this price. It then negotiates. There's a long period of negotiation. Often it ends up saying no. That is ordinary trading behavior. That is not the kind of behavior that Congress had in mind when you're talking about someone who has to hold large amounts of stock because when someone comes to it, it has to provide them stock or it has to buy stock if someone wants to sell stock. That's what a market maker does. It creates liquidity by being a place that you can go that is separate from the exchange. And I'll just – this is all on one – So I'm just trying to think like a flea market. So that doesn't count. In other words, if there's haggling, then it's not a market. I'll go to a flea market and I want to buy vinyls and they're going to have a whole bunch of them there and it says $2 and I'll say, yeah, I'll give you a dollar. It's not – so there's two separate arguments. We mostly focus on the first one. I'd like to, if I may, I know well over time, but have a couple of minutes on the second one. But it's not that that's not a market. It's that someone who is doing that kind of haggling is not a market maker. So the market maker is – Right.  Someone who is doing that kind of haggling is not – Now, there might be some – at the margins, if someone comes up to a – if you go up to someone at the foreign exchange counter and say, I'd like to have a million dollars, they might say no. Or they might say, I'm not sure I can do that. They're obviously going to be exceptional situations. Your view is that a market maker has to offer a price, publicly announce that price, and then sell at that price, no questions asked. I mean, there might be some extreme scenario where it's like, exactly, a million dollars at the foreign exchange counter. They say, sorry, I can't do that. But yes, exactly. That's what it is. That is the definition that this court – But that's not equivalent about price. That's equivalent about volume. Right. Yeah, maybe that's right. Exactly. I think that's probably right. And they have an example in the special study where there's some bargaining. That's basically bargaining about volume because those are just for block transactions. But yeah, that's basically what it is. And this is – if you look at any of the regulatory materials, the SEC and FINRA guidance on regulation show, for example, or if you look at the SEC website, you look at Black's Law Dictionary, you look at precedent from any of the courts of appeals, that is the basic idea of what a market raker is. Publicly displays the quote, the bid, and the ask. It has to stand ready to make those transactions. And how does it make money? Well, it'll sell and buy at slightly different rates, just like you see at the foreign exchange counter. So that's the distinction you would say between the CRA, right? That's a situation where you've got this over-the-counter debenture market, right? But incident to that, there are shares being purchased to offset or to hedge rates, right?  And so you're saying that that works only because the debentures are being offered with firm public quotes? Yeah, absolutely. CRA is a classic, normal case. There was an OTC market, everyone agrees, completely set from the national exchange. They were offering debentures. They were holding these debentures. If someone came to CRA and said, and this is what all the unrebutted affidavits in CRA said, yes, they basically were trading those debentures. They were standing ready to buy and sell those debentures. And then what they had to do was they had to do hedging transactions on the national exchange. Everyone agrees those were on the national exchange, and those were incident to the undisputed OTC market in debentures. And the only question in CRA Realty was, well, it's a debenture and not a security. So is that the right kind of OTC market? Because they're not really making a market in securities. And this court said, yes, because a debenture and a security are economic equivalents. Absolutely right, no problems at all. This case is so fundamentally different. Here there is no OTC market at all. They're not market making in the way that the Drexel was in CRA Realty because they're not doing any of those things, that bid and ask price thing, the public standing ready to buy, the refusing to deal, all that stuff is they're not doing. What they're doing here is they're just making deals based on their own proprietary trading strategy when it suits them and refusing to make deals when it doesn't suit them. Then separately we have an independent basis, which is, you know, that would be enough. But they're also then going and availing themselves of the national exchange. They're actually executing these transactions on the national exchange. And this court's precedent, which they never cite, and I think that's telling, is when does a transaction occur? A transaction occurs at the point of irrevocable commitment. And it's absolutely clear here that the point of irrevocable commitment was when they went and executed the transaction on the exchange. Their own expert says that this is a... So they negotiate through text, email, or phone to buy a package for this much. And you're saying that's not... they're not obligated to buy at that point? They're not obligated to buy at that point. They routinely do not buy at that point. So their own expert at JA 1045 says that orders can be canceled until they become fully executed trades. If you look at the Landelius Report at JA 2402, it details lots of canceled trades. And then you can see the records of that at JA 1138 to 1141. So there were lots of canceled trades. And you can see this on the chats, too, at JA 232. They look for express authorization before they actually confirm the trade. So the only point of irrevocable commitment is when you then go and you avail yourself of all the facilities of the exchange. You execute the trade there. You are automatically rerouted to the clearinghouses that exist on the exchange. You use the exchange as settlement facilities. So you're getting all of the benefits of the exchange, and the point of irrevocable commitment is the point at which you then go and do all of this stuff on the exchange. They say that, well, none of that matters because price discovery is the only thing that matters, and that happens on the chats. At the threshold, we dispute that. If you look at JA 2825, this is our response to their statement of undisputed facts. We said the search and price discovery did not occur off exchange. The price strike, price expiration date of each leg of the package trades were listed on the National Exchange. Their entire statement of facts is just quotes or citations to their own experts' report and own experts' deposition, but if you look, we refute that. If you look to JA 2800 to 2843, we refute almost all of that. So that is all disputed questions of fact, and I agree, it's very complicated. But the question is, when is it that there's an irrevocable commitment? And that question is at least a disputed question of fact. And the district court here kind of sidestepped all of that because the district court had a totally different theory. The district court's theory was basically it accepted that the transactions were happening on the exchange. This is what it said at footnote 11. It is clear that the transactions in the individual legs of each package occurred on an exchange. At SA 40, it says it's indisputable that many of HAP's individual trades were executed on the National Securities Exchange. But it said that the, quote, market definition was dispositive because if you define the market as one for packages, then, well, that market is really happening off exchange because you can't actually trade for the entire package on the exchange. But if you define it as trades, then the market is happening on the exchange. And that, I mean, they don't defend that on appeal, and I think that's for good reason because the market has to be for such security. It has to be, it can't just be a market for a package. And they say in their response brief at page 26, where the HAP has made, the question is where the HAP has made and kept in existence a forum in which parties buy and sell a security. So where is the forum where the security is traded? And the security is traded, according to the district court, on the exchange. It is indisputable, it says, that the transactions occurred on the exchange. So by the district court's own factual logic, I think that they're wrong. They don't defend that logic, and now they say the trades, the transactions, the forum was really the chats. But at a minimum, I think there's a question of fact as to whether or not the forum was the chats or whether it was actually the exchange when all of these things are happening on the exchange. They say that's all downstream processes. That's exactly the kind of argument we think we should be able to dispute to a jury. All right. Thank you, Your Honor. So you reserve some time for rebuttal. We'll now hear from Ms. Kahn. Thank you. Thank you, Your Honor. Good morning. May it please the Court, I'm Jennifer Kahn from Paul Hastings. On behalf of Appellee's Hap Trading, LLC, and Harsh Padilla, Section 16B of the Securities Exchange Act imposes strict liability on a very narrow class of insider trades. But as this Court... No, no, no, no, no. I mean, it's a very narrow class of trades. All it requires is that you have a certain percentage. That doesn't necessarily make you an insider. It just makes you somebody who's past the threshold for being liable, right? Correct. But the trades also have to be with a buy and sell or sell and buy within a six-month period. No, I get that. But you said insider trades. The only thing that makes these insider trades is just the number of shares that a particular person has. Absolutely. Within the definition, it's 10% beneficial owner as well as directors, officers, and others that qualify as insiders. That is absolutely correct. This Court and the Supreme Court have explained that it's inappropriate to impose a strict liability of 16B unless Congress has chosen to do so, quote, expressly or by unmistakable inference. And the district court here correctly held CLARIS doesn't come close to meeting that standard. Instead, the challenge trades fall squarely within the plain language of 16D and its exceptions liability. Yes, Your Honor. Just to, I'm sorry to interrupt your flow, but with regard to the reasoning that the district court used, your friend on the other side is saying that you're abandoning the district court's view of, yes, the trades are happening on the exchange, but they're in support of the market making and the packages and that on appeal, they're implying that you're abandoning that in favor of a current framing of, well, the trades are actually happening OTC, but they're executed on the exchange. Do you disagree with the way that the district court framed the issue? We don't disagree with the district court. We think the district court framed the parties' dispute in exactly the right way. The district court on page 32 of its decision framed this dispute as involving three issues. Just to be more specific, though, that the trades are happening on exchange, on the exchange. Do you adopt that? We don't think that's what the district court was saying. In footnote 11, where it says, it's clear the transactions in the individual legs of each package occurred on an exchange? The transactions occurred over the counter. The downstream processes occurred on an exchange. Well, no, the transactions occurred on an exchange. Well, we don't always use the exact same terminology as the district court, but we agree with the district court's conclusion on the three fundamental things. HAP acted as a market maker for purposes of the exception. The utilization of the exchanges to print the individual legs doesn't disqualify HAP from the exception. I think that's what you're referring to, Your Honor. And 16d also applies to HAP's trading, other trading, the hedging trades, where they did do a very small number of common stock trades on the NASDAQ, and those were incident to HAP's market making. And we think the district court framed it right. It actually summed it up on page 32 of its decision. We think the district court was clear that HAP made a market in these packaged trades, but these packaged trades were just composition of securities. They were options and common stocks. I guess the point that your adversary was discussing was that you're not posting a quote, like you're not saying we buy and sell at these prices. These are all bespoke negotiated transactions. Your Honor, there is no precedent, there is no authority that's been cited that requires HAP to publicly quote. Back in the special study, 60 years ago, when Congress was deciding to enact 16d, the special study described a process of over-the-counter market making that is very similar to exactly what HAP was doing today. An interested investor would make a phone call to an over-the-counter market maker. They would go back and forth, they would negotiate, and if they could come to rest on terms, and it wasn't just volume, it was volume, it was price, it was the parameters, then the transaction was completed. That is in the special study. That was 60 years ago. It's the same thing that HAP is doing today, on the phone and in the chats. And the negotiation doesn't take HAP out from under the statute, but there is no requirement that there be public quotations, and we know that for a number of reasons. So what's the difference between this and just a straight arbitrage situation? I guess I'm trying to understand that. Well, the issue here is really the market making. So HAP's business was to hold itself out as willing to buy and sell securities on a regular and continuous basis. And we know it did that because in the record there are numerous chats showing that market participants understood that HAP was a place to go to when it had a customer who wanted to buy or sell Clara securities. We see it again and again and again. It was a repetitious business. It happened throughout the summer of 2022. That is how HAP accumulated over 10%. So if I own a ton of IBM and I just make it clear that I'm a guy you can come to if you want to buy and sell IBM, I'm a market maker? Well, it's very different.  You would be an investor. Right. So what's the difference? I guess that's the question. Yeah. So first, HAP wasn't making a directional bet on the price of a security. It didn't have analysts. It didn't do research. It didn't look at the fundamentals. That wasn't its business. It wasn't like an investor deciding that a stock is undervalued and making a bet that the stock price is going to go up. It held itself out as its business, making it known to market participants that it was willing to buy and sell Claris and other securities on a regular and continuous basis. And it did that. It did it throughout the summer of 2022. So the market maker is just anybody who is willing to sell on a regular basis. So again, that seems to me that if I just own a boatload of shares and I make it clear I'm going to buy and sell, I'm a market maker. So what makes them a market maker? Well, they have to be a dealer. A market maker generally is somebody who's making money not on whether the value of the shares goes up or down. It's really about the spread between buying and selling. And that is exactly the way Hap made its money here. As I said, they weren't making a bet like an investor on fundamentals, saying that Apple is undervalued so I'm going to buy some Apple stock. As you just said, Your Honor, the way Hap made money was by purchasing securities at lower bid prices and selling those same securities at higher ask prices and doing it again and again and again. It would make a little bit on the trades, but it did it through repetitions. So when is the deal done? I guess that's my next question. It seems to me that if what your friend on the other side said was that this could be canceled at any time by the broker. The broker goes to the national exchanges to buy the actual shares. They can say, never mind, I've changed my mind. So it's not irrevocable at the time that the text or the email or the phone call says deal, right? Actually, no, Your Honor, we think there's a meeting of the minds in the chats and we think that that is where. And you can sit on that and say you've got to follow through. Well, that is where the parties have agreed to the transaction. Now, there still have to be these downstream clearing functions, which is the exact same function as on the exchange. Downstream clearing functions. I guess I don't – this is – the actual sale is taking place on a market and you're just – instead of calling it that, you're calling it a downstream clearing function. So explain that to me, too. So the purchaser sale occurs over the counter. That's where the parties come together and make an agreement.  That's of a package, right? That's a bundle of securities, right? Right, options and common stock. And so the parties have agreed. At that moment, these are the terms, these are the parameters. We have agreed to this trade. There are administrative processes, just like if I go to a flea market on Sunday and I buy a coffee table. I bought the coffee table, but I pay for it by a credit card and it has to be delivered to my house next week. I bought that coffee table. Even if you have to process my credit card or if it's payment on delivery and it gets delivered to my house later on, I still bought that coffee table on Sunday. And the market, more importantly, where I bought that coffee table, was the flea market. I mean, I'm going back to your bouquet analogy, and it seems like I've got a beautiful bouquet here. I say, you can buy it. And you say, great, we have a deal. And I say, good, okay, you should go buy the roses there and you should buy the pansies here, the baby's breath here, and pick another flower. And so that seems odd to me. It seems to me that you're not really selling a bouquet at that point. A bouquet that is being sold, it would be sort of sold in one shot, right? Well, and we think these are being sold in one shot. We think you're buying the entire bouquet over the counter. But it's really the floral designer, right? It's the person advising you, this is a good set of things to put together. This is a good set of Claris options and shares and things. And having that discussion and saying, and this is a good price to do it at, but then directing, going back and saying, all right, now buy these shares here and buy these shares here. It's more of the, what they're selling and what they're agreeing on is the constituent parts that are then going to actually be traded. Respectfully, Your Honor, taking the floral example again, you're buying all the flowers, you're buying the bouquet at the flower store. That's the market. And the fact that you may have different ways of paying for those flowers or if you buy something on Amazon Marketplace but you have other ways of settling that payment doesn't change where you are engaging in that transaction to buy and sell. And that transaction to buy and sell is happening over the counter. Claris itself has cited cases, including the Avalon case in the district court. It's about where you reach that agreement. It's not about the facilities and whether you call it downstream processes or administrative functions or payment and settlement. So the package is the security? A package is a compilation of securities. Right. And so looking at the statute, is that what the statute contemplates making a market in? Well, the market was made in securities. They were in options and common stock. But the markets for the options and common stock already existed. The market that you're saying your client created was a market for a package. Well. A bespoke, customized, unique package. And so then in order, I mean, under the statute, you're saying it's enough for it to be a variety of securities that it doesn't have to be the such security language of the statute. It doesn't require that the thing they're selling, which you just said the thing they're selling is the package, has to itself be a security. Well, the thing they're selling, well, the things they are selling are securities. They are just put together in a package. So they are selling securities. Individual securities are sold in this downstream, on the open exchanges. And the thing that is sold in the chat is the package. Well, these securities are sold both over the counter and on securities, and on the exchanges. And they use the same functions, the administrative functions, whether they're sold over the counter or on the exchange. But it cannot be the case that just because the securities that was trading over the counter had to be cleared through the exchange processes, takes it out from under 16D, because if that was the case, you could never have over-the-counter market making in a security that is traded on an exchange. And we know that's not the case. CRA Realty says that's not the case. You can make an over-the-counter market for purposes of 16D in a security that is otherwise traded on a national exchange. The fact that they use those same administrative functions doesn't take you out from under the statute. If that was the case, then you could never have this exception for securities. I'm just trying to correct CRA then. If Drexel is selling debentures and then says, oh, we'll also sell you some shares while we're at it, then they're a market maker and the shares, too? Well, their conduct would have to be such that they were continuously holding themselves out as being ready to buy and sell those securities over the counter. I don't know that the record in CRA established that. But going back to whether you have the processes and whether you have to publicly quote, and CRA makes clear that that's not required. There is no formalistic requirement of the way you be a market maker. But in CRA, tell me if I'm reading this wrong, the market that was made, the value added of this OTC market, is in the debentures. And it's that these trades, the hedging of the common shares, was incident to that market making. But in CRA, Your Honor, those debentures were also traded on the exchange. Right. And so what Drexel was doing was creating an over-the-counter market for a security that was traded both over the counter and on the exchange. And the fact that it was traded in both didn't take it outside of the over-counter market making exception. But is that the holding of CRA? The holding of CRA was that Drexel qualified as an over-the-counter market maker in the debentures and that the common stock trades on the exchange that were incident to that market making, that they did because they were hedging their exposure, were also covered under Section 16D. And we think that is completely on point with what HAP was doing here. HAP held itself out as being ready and willing to trade over-the-counter in Clara Securities. It did it over and over again throughout the summer of 2022. We see that in the chats. It's undisputed. There is no evidence in the record. It was never argued below. That argument was waived. But they're saying that there were trades that were just turned away. No, we're not doing that, that there was no quote bid. There was basically you want to do a deal and then haggling over price. Is that wrong? I don't know what chat they were pointing to. But, Your Honor, there is certainly no requirement that a market maker enter into every single transaction that is presented to it. It could be commercially unreasonable. So I can be a market maker and say I'm going to charge a dollar a share for this over-the-counter security for some people but not others. You can do that. You're a market maker. I'm going to give it. I'll offer you that deal. I'm not offering you that deal. There is no requirement. I'm not aware of any authority that says, as my colleague suggested, that you have to give everyone the same quotes. But isn't that a market? I mean, if Judge Sullivan and I both go to Whole Foods, the price of the chicken is going to be the same, I hope. But there's no requirement in this context. As I said, you have to publicly make available quotes. It was sufficient for market makers to know that you're available to trade and to approach you. That's exactly what was happening 60 years ago in the special study. And we can see that market participants did recognize HAP as a place where it could go to trade in Clara's securities. We see that in the chats. They did it again and again and again throughout the summer. And the fact that other market participants treated HAP as a market maker confirms that HAP held itself out as such. That's what CRA found. CRA found that fact persuasive in affirming the grant of summary judgment. We see the pattern here. It isn't just anyone can say, I'm willing to trade in Clara's securities. You still have to hold yourself out, a dealer holds themselves out, as being ready and willing to trade on a continuous basis. I'm still trying to figure out what makes this, I understand what makes it a good deal from Clara's perspective. What makes this a good deal? Why would anybody want to do this? Why do they want to be the counterparty on this package? What are they getting out of this? Meeting the broker's customers who approach HAP? Yeah, the broker's customers. Well, I mean, obviously, we don't know what's in the minds of all the investors who, through brokers, approach HAP. But one reason that these packages were appealing is it allowed certain investors, and you had asked this question, Your Honor, whether they were preexisting investors. We know at least of one who was a very sizable investor who went through a broker to approach HAP. Right. He might have had inside information, and he's trying to lock in, he's trying to hedge against the fluctuations that he knows are coming. And by doing these packages, you can actually be long in a stock without a lot of capital outlay. Otherwise, you're just going to have to buy a ton of common stock, which, first of all, would be very difficult to do in such large blocks without affecting the price. One of the reasons the packages were appealing is you couldn't do this kind of complex, large trade on an exchange. You certainly couldn't do it on a single one because these securities are not traded on a single exchange. But it would also allow an investor to be long by using options where they didn't have to pay the full amount that a common stock share would cost, but they would get exposure, and they would be making a directional bet, perhaps. HAP wasn't. But there would be reasons why this would be attractive. But, again, we obviously don't have complete visibility into the motivations. But there are reasons why, and we see it all throughout the summer. Lots of investors, I think there were at least 10 brokers, approached HAP throughout the summer, which just shows that this is not just an investor who decides one day it's willing to make a sale or a purchase. Well, how many transactions were there over the summer? Well, there were many packages. Many. How many? Millions? Tens of thousands? Dozens? Not millions, but each package could have hundreds of thousands of shares within it. So many, many shares. No, I get that. But this is all just sort of bespoke trades with, you know, half a dozen counterparties. That's different, it would seem to me, than a market, which is supposed to be sort of attracting more than just the odd person who wants to do a deal. Well, this was certainly more than the odd person. There were brokers. There were at least 10 in the record throughout a short period of time in the summer who approached HAP and actually did engage in transactions. Many packages. That is how HAP accumulated over 10 percent, although it was not what Claris suggests. They never held 32 percent or a third of the common stock of Claris. That is a function of the way beneficial ownership is calculated, including calls, which give you the right to purchase, which were never exercised. But HAP did engage in a robust, continuous, repetitive business with multiple brokers representing multiple customers throughout the summer. That was its business. It was not required to publicly quote. In fact, the SEC considered a proposal that would have required market makers to post quotes in 1966, and it abandoned that proposal. In CRA, we see that plaintiff actually presented evidence, unlike Claris, who presented no evidence. There is no disputed issue of fact. But in CRA, the plaintiff presented evidence that Drexel wasn't actually continuously quoting in the yellow sheets or the public forum where they would post quotes. I'm sorry to interrupt, but, I mean, you know, we have cases like Nomura and Morgan Stanley where that's, you know, opinion letters from the SEC. In CRA, there was a request for the SEC to give an opinion or to make a submission, and we don't have that here. And it's sort of curious to me, aren't they sort of a big voice that's not being heard here? Well, Your Honor, we think the statutory language is clear. And we also think if there's no— Well, Judge Cronin didn't think it was that clear. I mean, he, in fact, was sort of wringing his hands over how little guidance there was on this. He's basically relying on, you know, CRA, which is a 1984 case. Your Honor, we think CRA is on all fours. We think the statutory language is clear. But also note that if the Court finds there's any ambiguity, we also have Foremost McKesson, the Supreme Court, and CRA saying if there's any ambiguity, the clear statement rule applies and there should be no liability. But we also have the SEC's brief in CRA, which found— Well, there do seem to be some serious differences between CRA and your case. I mean, I don't think—I mean, CRA involves debentures being sold at a pretty straight price. It's a pretty uncomplicated thing. Yours are very bespoke arbitrage transactions. And so it's not clear to me that it's on all fours. I don't think even Judge Cronin thought that. So I'm glad you do. But why wouldn't we want to hear from the SEC on this? Well, Your Honor, as I said, we think the language is clear. We think the SEC's brief in CRA supports our position. We also recognize the text of the statute allowed the SEC to promulgate rules in this area and it hasn't done so. We think the Nomura and the Morgan Stanley letters actually support our position. We don't think it's necessary, but prefer not to wait. But, of course, if the Court wants to solicit the views of the SEC, we would have no objection. But as Your Honor noted, the SEC is certainly aware of this issue and aware of this case and chose not to speak. I think it's interesting that the leading authority on this issue, which my colleague cited during his argument, cited in the briefing, cited by the district court, Mr. Allen Dye, leading authority, the leading treatise here, agrees with our position that Section 16d clearly applies here. And, again, if there is any ambiguity, foremost McKesson and CRA say in this context if there is ambiguity, no liabilities should attach. Your Honor asked about the SEC's letters. We think Nomura is also similar to this situation where you have, again, a security that is traded on an exchange, which doesn't take you out from under the exception. But Nomura was buying shares on an exchange to make an over-the-counter market overseas in shares of Jakarta. Morgan Stanley is very different. Morgan Stanley, there was a cross of the trade. It actually used the market-making functions of the exchange by exposing that trade, those trades, to other market participants, to other investors who could then match the trades. It crossed. And the SEC, although there wasn't a lot of elaboration of the reasoning in the SEC's letter, the SEC refers to that public cross. And although Claris suggests that there was a regulation in place that would not require that public cross, that regulation was not in place until a year after the Morgan Stanley letters, but more importantly, still required that public cross. That was still required, and that makes this very different. One of the key issues here is whether HAP used the market-making functions of the exchange, and it didn't. The counterparties came together. They negotiated the price, the volume, the terms, and there was a meeting of the minds in the chats. The only thing that took place on the exchange were the administrative functions. Those same administrative functions are required to be used whether a security is traded over-the-counter or on the exchange. And if that were to take us out from under the exception, again, you could never have a security that is traded on an exchange avail themselves of the market-making exception of 16d because they have to use those functions, and the district court recognized that, and that is one of the reasons we know that you have to be able to use those functions without taking you out from under the exception. CRA is relevant for that reason. In CRA, it is clear that the debentures weren't only traded over-the-counter. They were traded on an exchange. But I just want to go back to the question of was that a disputed question in that case? Was this court deciding that a debenture or anything else that was traded on a national exchange can still qualify for OTC market-making? I know that was the fact, but it didn't look to me like either in the district court or in the circuit court in that case that was an issue that anybody was arguing about. Well, the SEC weighed in in that case and certainly didn't find that because the debentures were traded on an exchange. But that wasn't the question presented. It was one of those things that one said, this is fine, and just kept going, right? It wasn't presented to the court as the question to be decided. But the court did decide that Drexel qualified for the Section 16d exemption for the debentures that were clearly traded not only over-the-counter, but on the exchange. And that was before the court. Otherwise, the Section 16d exemption wouldn't have applied. I understand. But we often reach decisions by assuming certain things along the way. And it seems to me that CRA assumes that it's okay that the debentures are traded on the national exchange and doesn't actually say, nobody says actually judge judges. This can't be a market-maker exception because these are trades. I mean, I just want to be clear that that's, of course, it assumes that that's okay. But it doesn't seem to confront it the way we're being asked to confront it here today. And, Your Honor, we think there's other authority. As I said, Nomura, although it's not binding, it's persuasive. In Nomura, it was clearly an issue as to whether the exchange purchases of stock in the Jakarta fund somehow disqualified from what Nomura was doing when it purchased those shares and then sold it over-the-counter to investors in Japan. That was clearly presented. As I said, the SEC actually considered, has the ability to promulgate rules in this space very expressly and has chosen not to do so. There are a number of other indicia where we know that this exception applies to exchange-traded securities, even when they are traded over-the-counter. All right. Well, we got our money's worth. We'll hear from Mr. Digar-Sen for three minutes. We'll see if we can stick to that. Well, thank you, Your Honor. Two quick factor points and then three quick substantive points. The two factor points, one is it was 61 transactions, that's packages, that's a JA-129. So not a lot of, you know, packages for someone who's continuously doing this like the foreign exchange counter. And then the Romeo and Die trade is 1502 actually supports us. The thing which they quote in their brief is just, and it has a citation to the district court opinion in CR Realty, is just saying you don't have to hold yourself out on something like the yellow sheets. It doesn't have to be like, you know, some sort of particular kind of system or whatever it might be. But you have to hold yourself out as being, to the public, as being willing to buy and sell at particular prices. Maybe you don't even have to publicly post them. I think you probably do. But in the very least, you have to offer it to the same people on the same terms. And the most important thing is you have to be standing ready to fulfill those orders when they come in. So the three substantive points. Firstly, on foremost McKesson, the language there is that you shouldn't impose liability on the basis of, quote, unclear language. So that's a substantive canon, a bit like the rule of lenity. The Supreme Court has, I think, somewhat cussed out on those. But even if you assume it applies, there is no ambiguity in statutory language here. In foremost McKinnon, they were interpreting the phrase at the time of the purchase. In CR Realty, they were interpreting the phrase security. At this point, everyone agrees what all these terms mean. The question is, you know, does this particular conduct fall within the prescriptions of the statute? So it's a little bit like saying apply the rule of lenity in every criminal case to say that the conduct of this criminal doesn't quite fall within the statute. That's not the way that these substantive tie-breaking canons work. They only work if you have ambiguous statutory language. And we're not fighting over that anymore. So I don't think foremost McKesson has any role in this case anymore. Second, I think it became very clear from what we heard that this rule has no limiting principle. I completely agree with what you said, Judge Sullivan. If you are just someone who says, I'm willing to do, you know, says to the public, I'm willing to do business. I buy and sell securities. You are now a market maker under that definition. Well, was that any different than what Drexel was doing with the debentures? A hundred percent different. Because Drexel with the debentures, and this was what the unrebutted affidavit said, was we are willing to and we're going to buy and sell debentures at particular prices. So we're going to quote you a price and we are going to go through with the transaction. So they say a debenture is, you know, if you want five debentures, you can go to Drexel and you can get your five debentures. And if Judge Merriam wants them, she can get those five debentures at the same price because they're publicly quoting prices and they're standing ready to follow through on the transactions of debentures. That was undisputed in Sierra Realty. The only question was, you know, what about the transactions they're doing on the exchange? And the court said those were incident to that undisputed OTC market in debentures. The same in Nomura. There was an undisputed OTC market in Nomura stock in Tokyo. And what was happening, again, same thing. You could go and you could ask for five, you know, Nomura stock. You would be able to get it from that entity. But they needed, because they had to hold that stock in order to fulfill those bids, they needed to go to the U.S. exchange and get stock from there in order to fulfill those orders. I get that. So that's a very simple over-the-counter market. That's the point. And so the question is, all right, here we have something that's more bespoke and more complicated because it's a combination of securities. But, you know, why is that a critical difference for purposes of 16B? It's because they're not establishing a market in those securities. They're not standing ready to buy and sell at quoted prices of the security. That's undisputed. But I'll note it's not just about the complexity. It's not even as if what they're doing is they're standing ready to buy and sell the packages. You know, maybe they could have had, I mean, I think this wouldn't work still because it's the statutory language of security, not packages. But it's not like they're saying, all right, come with any package. We'll definitely quote you a price and we'll buy that package. And then we'll go and sell that package. And the way we make money is, you know, we're going to buy the package at a slightly lower price than we sell the package. That's what an over-the-counter market is. They didn't do anything like that. They have a proprietary strategy of delta neutrality. So they want a fraction of all the packages in the world that you could put together, infinitesimal. So they want delta neutral packages. Exactly. That's what they're buying. Yeah. So that, I mean, under that definition, literally anyone who has a proprietary trading strategy can say, yes, I'm dealing in packages. That's the market I'm making because I will do business when this particular package that fits my strategy, you know, is, you know. But I'm trying to figure out why that's so terrible. So, I mean, it seems to me the whole purpose for 16B is to prevent insider trading. We're talking about just the technical requirements of 16B and whether they've been met. But if there's no whiff of insider trading here, then why do we want to be so tight-fisted with defining what is a market? I mean, it would blow a hole in Section 16B liability because basically every hedge fund, I think, under that definition is, quote, standing ready to do business. You know, we do 61 trades in a summer. I mean, that's, you know, any hedge fund can say, yes, we buy and sell stock. Oh, yes, we buy and sell packages in the sense that the packages, you know, we have a strategy of dealing with stock and that's a package. And so anyone can basically get this exemption, and it will blow a huge hole in that, in the regime. And, yeah, I mean, the regime is strict liability because it's hard to prove intent. We did have, you know, we. And yet the SEC is silent. Well, they might not. I mean, I don't know. I think this is going to blow a hole in this and be a real problem that we would have heard from the SEC. Should we ask them to weigh in? That's what happened in CIO. I agree. I mean, we feel very confident that the SEC would agree with our interpretation here. So if you want to do that, I think that that is a completely reasonable thing to do in this situation. I do think the strategy here, and I would welcome, then, the chance to file an additional supplemental brief that addresses what the SEC says. But I strongly think that this is exactly the kind of situation which would blow a hole in the regime. And I'll also note, in terms of consequences, there are at least a dozen provisions across the Exchange Act that use the phrase market maker or refer to the market maker definition. So if you define market maker the way they want to, which essentially takes out the public quotation or even quotation element, and just as anyone who buys and sells, that's a market maker, that could create enormous mischief and have far-reaching consequences across the Exchange Act. So I certainly think you should ask the SEC before you affirm the district court. But, you know, I do think there's going to be significant consequences. And the final thing is on this question of what is the meaning of the mines. And all of the hypos and everything we heard, it's all just circular. It just comes down to they define what's happening in the Exchange as the downstream process, and they say, well, the meaning of the mines is the chat. That's the question. That's the factual question. What is the meaning of the mines is chat? Well, the meaning of the mines only comes when there's an irrevocable commitment. That's what this court's precedent is, and that's what the unbroken rule in the district court with regard to Section 16B is. If you can exit the transaction, then you haven't yet fully reached the meaning of the mines. When can they exit the transaction here? The record makes it that they can exit the transaction when it happens on the Exchange. So you're basically negotiating for, you know, the terms of a trade, the terms of a package, but then you actually go and do the business on the Exchange, and you avail yourself of all the benefits of the Exchange. That was just not what Congress had in mind. And then the final thing they say is that, well, you know, if you agree with us, then no one could possibly create an OTC market. I don't think that's true, and that's certainly not in the record. I think you could certainly have an OTC market where you don't execute every transaction on the Exchange. You do still have to use some of the clearinghouses that exist on the Exchange, but I don't think you need to use the Exchange for those. You could just work directly with the clearinghouses, and you don't need to use the Exchange as settlement procedure. So the idea there's no such thing as a non-Exchange-based trade, I don't think that's correct. It's certainly at least a question of fact and something that we at least want to be able to argue to the jury. And even if you step back, this is a statute that was created a long time ago. There was uncertainty as to which of these two markets, a special study reflects this, the OTC market or the Exchange market, which of these markets is going to be more prevalent. Obviously today the Exchange market is dramatically more prevalent than the OTC market, but that isn't a reason to then create, you know, use this narrow market making exception and blow a hole in 16B liability in a way that virtually any hedge fund could be able to exploit. All right. Well, thank you both. We will reserve decision. That concludes the argument.